O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SOUTHERN DIVISION

|  |  |
|---|---|
| **LECIA L. SHORTER,** | **Case No.: CV 12-7337-DOC (AGRx)** |
| **Plaintiff,** |  |
| **vs.** | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [79]** |
| **LEROY BACA, ET AL.,** |  |
| **Defendants.** |  |

Before the Court is Defendant County of Los Angeles, Leroy Baca, Deputy Jacqueline Ortiz, and Deputy Alejandra Avalos's ("Defendants") Motion for Summary Judgment, or, in the Alternative, for Summary Adjudication of Issues ("Motion") (Dkt. 79). Oral arguments were held in this matter on April 3, 2015. The Court requested additional briefing on April 6, 2015. After considering the papers and arguments raised by the parties, the Court GRANTS in part and DENIES in part Defendants' Motion.

## I.      BACKGROUND

This case arises from the alleged mistreatment of Plaintiff Lecia Shorter, while incarcerated for a 32-day period as a pretrial detainee. While in the County's custody, Shorter alleges that Defendants denied her needed medical care, subjected her to unsanitary living conditions, deprived her of food, clean clothes, and access to exercise, and conducted overly invasive searches. Shorter further contends that she was misclassified as mentally ill and denied access to her attorney. Plaintiff raises claims under 42 U.S.C. § 1983 premised on violations of the First, Fourth, Eighth, and Fourteenth Amendments of the U.S. Constitution. She also brings state law claims for negligent and intentional infliction of emotional distress, defamation, assault and battery, negligent hiring and supervision, and negligence. Many of the facts below are disputed, but are viewed in the light most favorable to Plaintiff, the non-moving party.

### A. Conditions of Confinement

Plaintiff was a pre-trial detainee at the Century Regional Detention Facility ("CRDF") in Lynwood, California from November 15, 2011 until December 17, 2011. Shorter Decl. (Dkt. 71-3) ¶ 2. Shortly after arriving, Plaintiff was taken to the mental health unit and given a yellow shirt and blue pants, indicating that she was a mental health inmate. *Id.* ¶ 25; Walton Dep. (Dkt. 83-2) at 119:2-21. Plaintiff states that a mental health professional never asked questions about her mental health status. Shorter Decl. ¶ 26. Defendants assert that Social Worker Kimberly Ronan performed a psychological assessment on November 16, 2011. Plaintiff was then placed in her housing unit, Module 2300, for further observation and stabilization. Mathevosian Decl. (Dkt. 90) ¶ 6, Ex. H ("Inmate Mental Health Documentation"). The social worker noted that Plaintiff's classification was due to her "past [history] in jail" and her "current uncoop[erative] behavior." *Id.* at 4. However, the records also indicate that she "did not appear to be a threat to self or others." *Id.* Module 2300, part of the facility's high observation housing ("HOH"), is intended for persons who are mentally ill. Walton Dep. at 44:13-23.

Plaintiff asserts that, during her 32-day incarceration, she was housed in a single-person cell and was forced to remain in that cell at all times, without any personal property, physical activity, or mental stimulation. Shorter Decl. ¶ 2. The only time she left her cell was for court

and clinic visits, the three times she showered, one attorney visit, and one day that she was permitted to watch television, handcuffed to a table, for a few hours. *Id.* On several occasions, Plaintiff was denied food after her purported refusal to cooperate with a strip search. Shorter Decl. ¶¶ 4-5. Plaintiff was not given clean clothes on a regular basis. *Id.* ¶ 13. On December 2, 2011, about halfway through her stay, Deputy Avalos began a practice of not opening the door chute so that Plaintiff could throw out her trash. *Id.* ¶ 14. Instead, the trash accumulated in a pile on the floor of Plaintiff's cell. *Id.* Plaintiff's cell never appeared to be cleaned during Plaintiff's incarceration. *Id.* ¶ 14.

Only detainees in HOH were handcuffed at all times when not in their cells, Avalos Dep. at 15:14–25, including during "rec time." Walton Dep. at 97:19-24. Unlike those in general population, HOH detainees were also not permitted to have writing materials. Walton Dep. at 123:18–24.

### B. Visual Body Cavity Searches

During her incarceration, Plaintiff was subjected to nine visual body cavity searches.[1] Shorter Decl. ¶¶ 3-6. To complete a search, Plaintiff was required to remove all of her clothing, lift her breasts, pull apart her inner thighs in order to open her vagina, and bend over and cough. *Id.* ¶ 3.

Plaintiff was "searched-out" each time she returned from the Criminal Courts Building ("CCB"). *Id.* ¶ 11. On six occasions after returning from CCB, Plaintiff performed the "search out" without incident. *Id.* ¶ 3. However, on three occasion, Plaintiff testifies that she had difficulty complying with the "search out" requests of Deputies Avalos and Ortiz. *Id.* ¶ 4-6.

---

[1] Defendants pointed out in oral arguments that the searches were not "body cavity" searches because the Plaintiff was never touched. Defendants' policies on searches, Walton Decl. ¶ 40, Ex. A-18, defines a strip search as "[a] search which requires a person to remove or re-arrange some or all of their clothing to permit a visual inspection of the underclothing, breasts, buttocks or genitalia," a visual body cavity search is "the visual inspection of a person's body cavities (i.e., skin folds, rectal and vaginal cavities)." While it is unclear which type of search the guards were performing, the searches are dealt with identically in the Defendants' policies, i*d.* at 2, reflecting a similar level of invasiveness.

### 1.     November 17, 2011

On November 17, 2011, Deputies Avalos and Ortiz requested that Plaintiff remove her clothing and give it to them. Shorter Decl. ¶ 4. Next, Deputy Avalos directed Plaintiff to bend over, open her vagina, and cough. *Id.* At the time, Plaintiff was experiencing her menstrual cycle, and initially refused to put her hand close to her vagina due to how heavily she was bleeding. *Id.* However, she eventually complied with the instructions, removed her sanitary pads, bent over, and coughed. *Id.* Deputy Avalos told Plaintiff that was not good enough, and Deputy Ortiz said "I guess you want to stay like that all night." *Id.* Plaintiff was then chained to her cell door "with nothing on except panties." *Id.* The deputies also took Plaintiff's lunch, and Deputy Ortiz said "you also must not want dinner." *Id.* Plaintiff remained chained to her door for an extended period,[2] and without her clothing until the next day. *Id.* A man from the psych department came to her cell with questions while she was still mostly nude. *Id.* At around 3:00 p.m., the deputies returned her clothes. *Id.*

---

[2] In Plaintiff's declaration, attached to her opposition, she notes that she was chained to the cell door for 4 hours. In a letter to Leroy Baca dated January 12, 2012 ("Letter"), attached as Exhibit A to her Complaint, Mathevosian Decl. (Dkt. 90) Ex. J, she wrote that on November 17, 2011 a "female deputy" said "I guess you want to stay like that all night," and that only later Deputy Ortiz walked by and asked whether Plaintiff was "ready to cooperate." *Id.* at 21; First Am. Compl. ("FAC") (Dkt. 8) at 16. Plaintiff states that 45 minutes later she was able to escape from the handcuffs and remained in her cell without clothing until the next day. Defendants complain that the Declaration and Exhibit are inconsistent and therefore should be disregarded. However, the statements as to time are not contradictory. In the Letter, Plaintiff wrote that she escaped the handcuffs 45 minutes after Ms. Ortiz walked by – not after being chained to the door. The time period is consistent. Defendants also note that Plaintiff failed to provide facts about the November 17 incident in her interrogatory requests. However, she explained that her complaints extended from November 15 through December 17 and included "being chained and handcuffed to the door of her cell by…[Deputies] Avalos and Ortiz without clothes on numerous occasions." Mathevosian Decl. Ex. G at 3. This response was sufficient and not inconsistent with Plaintiff's declaration.

### 2.       November 23, 2011

On November 23, 2011, Plaintiff was subjected to another body cavity search by Deputies Avalos and Ortiz. *Id.* ¶ 5. She removed her clothes, pulled down her underwear, pulled open her inner thighs, and coughed. *Id.* The deputies yelled, "We didn't see you, do it again." *Id.* She repeated the action twice more, and the deputies insisted that Plaintiff did not "search out" properly. *Id.* Plaintiff asked for instruction on the proper method of performing the search, and the Deputies declined to show her. *Id.* The Deputies refused Plaintiff's request to get their supervisor. *Id.* Deputy Ortiz stated "you must want to stay like that all night and you don't want to eat." *Id.* Plaintiff remained chained to the cell door for four or six hours. *Id.*; Shorter Dep. at 59:23. Her dinner was eventually provided, but subsequently removed, as the person delivering the food did not want to "get in trouble." Shorter Decl. ¶ 5.

### 3.       November 29, 2011

On November 29, 2011, Deputies Ortiz and Avalos again told Plaintiff that she was not searching out properly. *Id.* ¶ 6. She was chained to the cell door and left there wearing only a shirt. At one point, Deputy Avalos returned to the cell and tightened Plaintiff's handcuffs. Plaintiff remained chained to the door without bottoms for three hours until a male officer unlocked the handcuffs. *Id.*

During the three searches in front of Deputies Avalos and Ortiz, Plaintiff spent approximately 15-20 minutes fully naked, and was forced to open her vagina multiple times. *Id.* ¶ 4.

### 4.       "Dry Runs"

On several occasions, Plaintiff was transported to the CCB for a "dry run." Shorter Decl. ¶¶ 10-11, Lee Decl. Ex. 4 ("Inmate Total Movement History"). During a dry run, an inmate, instead of appearing in court, simply waits in the building before returning to the detention center. Avalos Dep. at 49:6-7. On each of these occasions, despite a lack of contact with anyone other than Los Angeles Sheriff Department ("LASD") personnel, Plaintiff was still subject to the visual body cavity search upon her return. *Id.* ¶ 11.

### C.  Medical Treatment

Plaintiff has a history of blood clots and fainting. Shorter Decl. ¶ 15. She was prescribed Coumadin, a blood thinner, for treatment in 2006. *Id.* While on Coumadin, Plaintiff must have blood tests to monitor her International Normalized Ratio ("INR"). *Id.* Plaintiff states that while she was incarcerated, Defendants failed to test her blood for an extended period, and instead simply began dispensing Coumadin to Plaintiff. When her blood was tested on November 30 to determine her INR, it was 4.4, meaning her blood was dangerously thin. *Id.* Defendants ceased dispensing Coumadin to Plaintiff from December 1 until her release on December 17. *Id.* ¶ 18. Upon her release, Plaintiff went to the hospital to have her blood tested and her INR was 1.0, meaning her blood was dangerously thick. *Id.* ¶¶ 19-20.

Plaintiff also requested to see a dentist but was never permitted to see one. *Id.* ¶ 23. After her release she went to a dentist, and the tooth she had complained about eventually fell out. *Id.*

### D.  Procedural History

Plaintiff commenced her suit on August 27, 2012 proceeding *pro se* and *in forma pauperis* (Dkt. 1). Plaintiff filed an amended complaint on November 1, 2012 (Dkt. 8). Plaintiff retained counsel through the Court's Pro Bono Civil Rights Panel on October 6, 2014, after the initial discovery cut-off (Dkt. 68). On November 11, 2014, the Court granted Plaintiff's motion to reopen discovery for the limited purpose of taking the depositions of Defendants Avalos, Ortiz, and the County of Los Angeles 30(b)(6) representative (Dkt. 78).

Defendants now move for summary judgment as to all counts. They argue, first, that Plaintiff cannot establish policies, customs, or practices sufficient to establish a claim against the County, pursuant to *Monell*. *Monell v. Dep't of Soc. Serv's of City of New York*, 436 U.S. 658, 691 (1978). Second, they maintain Plaintiff cannot show facts to support violations of her constitutional rights. Specifically, they argue that Plaintiff's Eighth Amendment claims regarding conditions of confinement fail because there is no evidence that she was deprived food, clothes, or sanitation; that her claim of inadequate medical treatment fails because Plaintiff cannot show deliberate indifference to her medical needs; that Plaintiff's excessive force claim fails because Plaintiff cannot show that more than *de minimis* force was used; and

that Plaintiff cannot show she lacked access to the courts. Third, Defendants assert that Plaintiff simply has no constitutional right regarding her classification status of "mentally ill," or any right to file a jailhouse grievance regarding her conditions of confinement. Fourth, Defendants argue that Plaintiff's claims against individual officers fail as the facts in dispute show no constitutional violation, and, in any event, the officers would be entitled to qualified immunity.

## II.   LEGAL STANDARD

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is to be granted cautiously, with due respect for a party's right to have its factually grounded claims and defenses tried to a jury. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1992); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it need not disprove the other party's case. *Celotex*, 477 U.S. at 323. When the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out that the non-moving party has failed to present any genuine issue of material fact as to an essential element of its case. *See Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990).

Once the moving party meets its burden, the burden shifts to the opposing party to set out specific material facts showing a genuine issue for trial. *See Liberty Lobby*, 477 U.S. at 248-49. A "material fact" is one which "might affect the outcome of the suit under the governing law . . . ." *Id.* at 248. A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982). Rather, there must be specific, admissible evidence identifying the basis for the dispute. *Id.* The court need not "comb the record" looking for other evidence; it is only required to consider evidence set forth in the moving and opposing papers and the portions of the record cited therein. Fed. R. Civ. P. 56(c)(3); *Carmen v. S.F.*

*Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Liberty Lobby*, 477 U.S. at 252.

### III.    ANALYSIS

Plaintiff brings her federal claims under 42 U.S.C. § 1983. Section 1983 provides:

> Every person who, under color of any statute … of any State … subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured...

To prove a violation under § 1983, Plaintiff must show that: (1) Defendants conduct deprived Plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States and (2) Defendants committed the act under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988).

A municipality is a "person" within the meaning of § 1983; however, a municipality "cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691. A municipality may be liable under § 1983 only where the constitutional deprivation was caused by the implementation or execution of "a policy statement, ordinance, regulation, or decision officially adopted and promulgated" by that body's officers. *Id.* at 690.

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

Finally, a defendant may be held liable as a supervisor under § 1983 "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation."

*Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (citing *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)).

The Court will first address Plaintiff's substantive constitutional violations collectively, and will subsequently address liability as to each Defendant in turn.

### A. Substantive Constitutional Violations

The parties agree that Plaintiff was a pretrial detainee at the time of her incarceration. Therefore, her constitutional claims "arise[] from the due process clause of the fourteenth amendment and not from the eighth amendment prohibition against cruel and unusual punishment." *Jones v. Johnson*, 781 F.2d 769, 771 (9th Cir. 1986) (citing *Bell v. Wolfish*, 441 U.S. 520, 573 n. 16 (1979)), *overruled on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014). "[T]he more protective fourteenth amendment standard applies to conditions of confinement when detainees ... have not been convicted" of a crime. *Gary H. v. Hegstrom*, 831 F.2d 1430, 1432 (9th Cir. 1987) (citing *Youngberg v. Romeo*, 457 U.S. 307 (1982) (civilly committed individuals); *Bell*, 441 U.S. 520 (pretrial detainees)). "[T]he Fourteenth Amendment prohibits all punishment of pretrial detainees." *Demery v. Arpaio*, 378 F.3d 1020, 1029 (9th Cir. 2004). "This standard differs significantly from the standard relevant to convicted prisoners, who may be subject to punishment so long as it does not violate the Eighth Amendment's bar against cruel and unusual punishment." *Pierce v. Cnty. of Orange*, 526 F.3d 1190, 1205 (9th Cir. 2008). Therefore, the Fourteenth Amendment requires the government to do more than provide the "minimal civilized measure of life's necessities," *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981), to non-convicted detainees. To assess the constitutionality of pretrial detention conditions that are not alleged to violate any express constitutional guarantee, a district court must determine whether those conditions amount to punishment of the detainee. *Bell*, 441 U.S. at 535; *Pierce*, 526 F.3d at 1205; *Demery*, 378 F.3d at 1029.

Although Plaintiff's claims regarding her conditions of confinement and medical needs arise under the Due Process Clause, for claims involving indifference to medical needs, "the eighth amendment guarantees provide a minimum standard of care for determining [her] rights as a pretrial detainee." *Jones*, 781 F.2d at 771. "In light of the Supreme Court's rulings that

conditions of confinement violate pretrial detainees' Fourteenth Amendment rights if the conditions amount to punishment, ... and that failure to prevent harm amounts to punishment where detention officials are deliberately indifferent, ... we have concluded that the 'deliberate indifference' standard applies to claims that correction facility officials failed to address the medical needs of pretrial detainees." *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1242 (9th Cir. 2010) (internal citations omitted); *see also Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998) ("Because pretrial detainees' rights under the Fourteenth Amendment are comparable to prisoners' rights under the Eighth Amendment, however, we apply the same standards." (citing *Redman v. County of San Diego*, 942 F.2d 1435, 1441 (9th Cir. 1991))). Therefore the Court will look to the Eighth Amendment standard of deliberate indifference in considering Plaintiff's claims of inadequate medical care.

In addition, "[t]he fourth amendment guarantees '[t]he right of the people to be secure ... against unreasonable searches and seizures.' This right extends to incarcerated prisoners; however, the reasonableness of a particular search is determined by reference to the prison context." *Michenfelder v. Sumner*, 860 F.2d 328, 332 (9th Cir. 1988).

### 1.  Classification Status

Plaintiff argues that her classification as mentally ill violated her constitutional right to procedural due process because (1) Plaintiff had a constitutionally-protected liberty interest in being classified as mentally healthy, due to the significant liberty restriction occasioned by the classification status of mentally ill and (2) she was evaluated, if at all, only for a few minutes by a social worker prior to being assigned to HOH.

"A liberty interest may arise from either of two sources: the due process clause itself or state law." *Carver v. Lehman*, 558 F.3d 869, 872 (9th Cir. 2009) (citations omitted).

Plaintiff has two identifiable liberty interests at play: (1) the status of the classification of "mentally ill," and disparate treatment that it occasioned; and (2) the deprivation of certain beneficial conditions in HOH that she would have been afforded in the general population, including additional recreation time without shackling and access to writing instruments.

First, the Ninth Circuit has held that segregated confinement of pretrial detainees, where that confinement amounts to punishment, must be accompanied by a due process hearing. *Mitchell v. Dupnik*, 75 F.3d 517, 524 (9th Cir. 1996).  This arises from the principle that "a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Id.* (citing *Bell,* 441 U.S. at 535).

In addition, once a State has granted prisoners a liberty interest, due process protections are necessary "to insure that the state-created right is not arbitrarily abrogated." *Vitek*, 445 U.S. at 488-89 (quoting *Wolff v. McDonnell*, 418 U.S. 539, 557 (1974)). To determine if there is a state-created right in cases involving the procedural due process rights of pre-trial detainees, the Ninth Circuit applies the *Hewitt* test. *See Myron v. Terhune*, 476 F.3d 716, 719 (9th Cir. 2007) (citing *Valdez v. Rosenbaum*, 302 F.3d 1039, 1044 n.3 (9th Cir. 2002)); *but see Orth v. Balaam*, 528 F. App'x 723, 727 (9th Cir. 2013) (to the extent that a pretrial detainee argued that he was entitled to a hearing before his placement in Behavioral Review, his claim failed because he was not deprived of a liberty interest under *Sandin* (citing Serrano v. Francis, 345 F.3d 1071, 1078 (9th Cir. 2003)).

Under *Hewitt*

> [a] state law must satisfy two requirements in order to create a liberty
> interest protected by the Constitution. First, the law must set forth
> "'substantive predicates" to govern official decision making' and, second, it
> must contain 'explicitly mandatory language,' *i.e.,* a specific directive to
> the decisionmaker that mandates a particular outcome if the substantive
> predicates have been met.

*Valdez*, 302 F.3d at 1044 (*Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 462–63 (1989); *Hewitt v. Helms*, 459 U.S. 460, 472 (1983)).

Plaintiff argues that she had a state-created liberty interest in being housed in the general population housing.

> The evidence in the record shows that in the CRDF, pretrial detainees who
> were not deemed mentally ill were housed in ordinary general population

housing. Pretrial detainees who were deemed mentally ill were initially placed in High Observation Housing, located in the housing modules 2300 and 2400. If detainees in HOH were no longer deemed mentally ill, they would first be transferred to Medium Observation Housing, until they were deemed fit to be placed in general population housing.

Pl. Response Brief (Dkt. 95) at 2-3 (citing Walton Dep. at 42:14–44:23; 49:12–50:12; 139:10–16; Ortiz Dep. at 56:18–57:22; Avalos Dep. at 11:2–15).

In addition, as a result of her classification as mentally ill, Plaintiff argues that she was subjected to more hostile conditions than otherwise-classified inmates. For example, "high mental" inmates were handcuffed at all times when outside their cells, unless showering, while other detainees were not subject to this treatment. Avalos Dep. (Dkt. 83-2) at 15:1-25. Additionally, when Plaintiff was transported to CCB she would be "forced into a holding cell with inmates who appeared to have serious mental health issues." Shorter Decl. ¶ 2. Deputies also had more discretion over the activities of HOH inmates, apparently controlling the frequency of showers, meals, and recreation time. Partly as a result of her classification, Plaintiff was denied virtually all showers and recreation time.

Defendants argue that "a prisoner has no constitutional right to a particular classification status." Mot. at 9 (citing *Hernandez v. Johnson*, 833 F.2d 1316, 1318 (9th Cir. 1987)). In *Hernandez*, the Ninth Circuit concluded that the inmate had no protectable liberty interest in a classification status, such as "violent" or "non-violent." *Id.* This case is inapplicable because, in *Hernandez*, there was no record that the inmate's classification had an impact on where he was housed. *Id.*[3] Further, *Hernandez* involved a convicted prisoner, not a pretrial detainee. *Myron*, 476 F.3d at 719 (addressing different standards applied for the alleged liberty interest of pretrial detainees versus convicted prisoners).

---

[3] The court also expressly acknowledged that "[a] different question might be presented if a prisoner's classification adversely affected his eligibility for parole or good time credits," and declined to decide the issue. *Hernandez*, 833 F.2d at 1318.

Plaintiff argues that the she has a protectable interest in her classification status under *Hewitt* and *Mitchell*. The Court agrees, although notes that the interest arises directly under the Due Process Clause. As detailed above, Plaintiff's classification had the *de facto* effect of imposing punitive conditions not imposed on the general population. These conditions included deprivation of recreation, mandatory shackling while outside of her cell, and other miscellaneous restrictions, such as the deprivation of writing implements. Therefore, prior to her classification as "mentally ill" Plaintiff was entitled to procedural protections. *Mitchell*, 75 F.3d at 524.

There is an issue of fact as to what procedural protections were afforded and what policies governed the classification of inmates as mentally ill. Plaintiff states that she was not evaluated by any mental health professional before her classification. Defendants assert that she was evaluated by a social worker in the psychology department, but Defendants have not established that this complied with County policies. This conflicting evidence is sufficient to foreclose summary judgment as to whether Plaintiff was deprived required process regarding her classification as mentally ill, in contravention of the Fourteenth Amendment's Due Process Clause. Summary judgment as to the violation of Plaintiff's Fourteenth Amendment rights as a result of her classification status and subsequent confinement is therefore denied.

## 2.    Conditions of Confinement

Preliminarily, the Court construes Plaintiff's claim regarding her conditions of confinement as a claim under the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (A document filed *pro se* is "to be liberally construed.").

Under the Due Process Clause, pretrial detainees have a right against jail conditions or restrictions that "amount to punishment." *Bell*, 441 U.S. at 535–37; *see also Pierce*, 526 F.3d at 1205; *Valdez*, 302 F.3d at 1045 (Pretrial detainees have a substantive due process right against restrictions that amount to punishment). This right is violated if restrictions are "imposed for the purpose of punishment." *Bell*, 441 U.S. at 535. There is no constitutional infringement, however, if restrictions are "but an incident of some other legitimate government purpose." *Id.*

In such a circumstance, governmental restrictions are permissible. *United States v. Salerno*, 481 U.S. 739, 748 (1987) (holding that the pretrial detention contemplated by the Bail Reform Act is regulatory in nature, and does not constitute punishment before trial in violation of the Due Process Clause).

In addition to the conditions that arose because of her classification, described above, Plaintiff has also produced evidence that: (1) she was permitted to shower only on three occasions; (2) she was only permitted outside of her cell for recreation on only one occasion; (3) her cell was never cleaned during her incarceration; (4) Defendants did not provide her with clean clothing; and (5) Defendants deprived her of food.

The Court must determine whether Plaintiff has provided evidence that her conditions of confinement amounted to punishment.

"In distinguishing between a permissible restriction and impermissible punishment, we first examine whether the restriction is based upon an express intent to inflict punishment." *Valdez*, 302 F.3d at 1045 (citing *Salerno*, 481 U.S. at 747).

In this instance, Plaintiff has come forward with evidence that certain of her conditions of confinement were intended as punishment. On numerous occasions, Plaintiff reported that food was deliberately withheld as a result of her purported failure to properly "search out." Plaintiff also asserts that officials at the facility intentionally deprived her of an opportunity to dispose of trash, thus creating an unsanitary condition in her cell. These facts are all consistent with an express punitive intent.

Additionally, absent evidence of express punitive intent, it may be possible to infer a given restriction's punitive status "from the nature of the restriction." *Pierce*, 526 F.3d at 1205; *see also Valdez*, 302 F.3d at 1045; *see Demery*, 378 F.3d at 1030 (noting that "to constitute punishment, the harm or disability caused by the government's action must either significantly exceed, or be independent of, the inherent discomforts of confinement"). "[T]he determination of whether a particular condition or restriction imposes punishment in the constitutional sense will generally turn on whether an alternate purpose is reasonably assignable." *Pierce*, 526 F.3d at 1205.

> If a particular condition or restriction of pre-trial detention is reasonably related to a legitimate governmental objective, it does not without more, amount to 'punishment.' Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

*Bell*, 441 U.S. at 539 (quoting *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 168–69 (1963)). Legitimate nonpunitive governmental objectives include "maintaining security and order" and "operating the [detention facility] in a manageable fashion." *Pierce*, 526 F.3d at 1205 (citing *Bell*, 441 U.S. at 540 n. 23).

> A reasonable relationship between the governmental interest and the challenged restriction does not require an 'exact fit' nor does it require showing a 'least restrictive alternative.' The only question that we must answer is whether the defendants' judgment was 'rational,' that is, whether the defendants might reasonably have thought that the policy would advance its interests.

*Valdez*, 302 F.3d at 1046 (citing *Mauro v. Arpaio*, 188 F.3d 1054, 1060 (9th Cir. 1999) (en banc), *Thornburgh v. Abbott*, 490 U.S. 401, 410–12 (1989)).

### a.  Exercise

Exercise is one of the basic human necessities protected by the Eighth Amendment.[4] *See Pierce*, 526 F.3d at 1211 (citing *LeMaire v. Maass*, 12 F.3d 1444, 1457 (9th Cir. 1993) (as amended)); *Hutchings v. Corum*, 501 F. Supp. 1276, 1294 (D. Neb. 1980) (in a § 1983 class action challenging pre-trial conditions of confinement, holding that defendants' failure to

---

[4] Although the Fourteenth Amendment right of detainees to be free from punitive conditions of confinement applies to this claim, whether a condition is considered a "basic human necessity" under the Eighth Amendment informs the assessment of whether the deprivation of this need amounts to a punitive condition.

provide each inmate one hour per day of exercise outside the cells is a constitutionally

intolerable condition). Courts have found that detainees "who are held for more than a short

time and spend the bulk of their time inside their cells are ordinarily entitled to daily exercise,

or five to seven hours of exercise per week, outside their cells." *Pierce*, 526 F.3d at 1212 (citing

*Campbell v. Cauthron*, 623 F.2d 503, 507 (8th Cir. 1980) (holding that pre-trial detainees are

generally entitled to one hour of exercise outside their cells daily if they spend more than

sixteen hours per day in their cells); *Housley v. Dodson*, 41 F.3d 597, 599 (10th Cir. 1994) ("'a

failure to provide inmates (confined for more than a very short period []) with the opportunity

for at least five hours a week of exercise outside the cell raises serious constitutional

questions'")).

In *Pierce*, the Ninth Circuit found:

> The record shows that pre-trial detainees in administrative segregation and
> other restrictive classifications, such as protective custody, are typically
> afforded, at best, only ninety minutes weekly in a space equipped for
> exercise. Although we need not hold that there is a specific minimum
> amount of weekly exercise that must be afforded to detainees who spend
> the bulk of their time inside their cells, we hold that providing the
> equivalent of slightly less than thirteen minutes of exercise a day does not
> give meaningful protection to this basic human necessity. We therefore
> conclude that plaintiffs have established a violation of § 1983.

*Pierce*, 526 F.3d at 1212 (citations omitted). Due to the minimal amount of exercise permitted

to inmates in administrative segregation, the Ninth Circuit concluded that the policy amounted

to "punishment" of pretrial detainees. *Id.*

Defendants do not provide any specific reasons why Plaintiff was denied recreation

time: for example, if Plaintiff had been hostile, violent, or not following protocol. Absent any

justification for the restriction on recreation time, there is sufficient evidence to conclude that

this restriction alone was punitive, in violation of the Fourteenth Amendment due process

clause.

### b.  Sanitation

Plaintiff also notes that she was deprived access to showers, clean clothes, and that her cell was not cleaned during her entire 32-day stay.[5] These are all basic necessities protected by the constitution. *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000) ("Prison officials have a duty to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care, and personal safety"). Defendants provide no plausible justification for this type of condition, and, indeed, the County's own policies counsel against such treatment. Mot. at 9; DUF 6 (LASD policy providing inmates shall be able to shower at least every other day); DUF 9 (LASD policy requires that each facility shall provide supplies and equipment necessary for the continuing maintenance of highly sanitary conditions). Evidence shows that Plaintiff asked for clean clothes and was denied. As there appears to be no legitimate penological interest in preventing a pretrial detainee from accessing clean clothes, regular showers, and a sanitary cell, the trier of fact may infer that these conditions constituted a constitutionally impermissible punishment.

Considering the factors above, Plaintiff has presented sufficient evidence to suggest that her conditions of confinement amounted to punishment in contravention of the Fourteenth Amendment's Due Process Clause.

### 3.     Body Cavity Searches

Next, Plaintiff argues that the "harassing and humiliating body cavity searches" to which she was subjected violated her Fourth Amendment rights.

The Supreme Court has stated that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological

---

[5] Defendants take the position that, because Plaintiff was out of her cell on nine occasions during her incarceration, she has no personal knowledge of whether her cell was cleaned during that time. Def. Evid. Objs. at 3 ("Shorter would have no personal knowledge of whether her cell was cleaned when she was not inside of her cell."). This may be technically correct, but  Plaintiff may testify to the fact that either her cell was not cleaned, or it was cleaned in such a deficient manner that a person spending nearly 24-hours a day in that confined space observed no indications that the cell had actually been cleaned.

interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). The Court identified four factors to guide reviewing courts in applying this test: (1) the existence of a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) the existence of alternative means of exercising the right that remain open to prison inmates; (3) the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and (4) the absence of ready alternatives as evidence of the reasonableness of the regulation. *Id.* at 89–91; *Thompson v. Souza* ("*Souza*"), 111 F.3d 694, 699 (9th Cir. 1997).

The Ninth Circuit applies the *Turner* test to prisoners' Fourth Amendment claims. *Souza*, 111 F.3d at 699. The Ninth Circuit has recognized that the Fourth Amendment applies to the invasion of bodily privacy in prisons. *Bull v. City & Cnty. of San Francisco*, 595 F.3d 964, 974-75 (9th Cir. 2010).

Generally, strip searches do not violate the Fourth Amendment rights of prisoners or pretrial detainees. *See Michenfelder*, 860 F.2d at 332-33. Strip searches that are "excessive, vindictive, harassing, or unrelated to any legitimate penological interest," however, may be unconstitutional. *Id*. at 332.

In determining whether strip search policies pass constitutional muster, courts typically employ the balancing test articulated in *Bell*:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place which it is conducted.

441 U.S. at 559.

Here, Plaintiff raises two substantive problems with her searches: (1) the fact that the searches occurred even after a "dry-runs" when she did not encounter any non-LASD personnel (the justifications and scope); and (2) the extremely harassing manner in which several of her

body cavity searches were conducted (manner and place). Thus, Plaintiff challenges both the policy and its implementation.

### a.  Justification and Scope

Courts routinely recognize the need of detention facilities to keep the premises free from drugs, weapons, or other contraband. *See, e.g.*, *Bell*, 441 U.S. at 559 ("A detention facility is a unique place fraught with serious security dangers."). "Facility personnel, other inmates, and the new detainee himself or herself may be in danger if these threats are introduced into the jail population." *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 132 S. Ct. 1510, 1513 (2012); *Way v. Cnty. of Ventura*, 445 F.3d 1157, 1161 (9th Cir. 2006) ("We recognize the difficulty of operating a detention facility safely, the seriousness of the risk of smuggled weapons and contraband, and the deference we owe jail officials' exercise of judgment in adopting and executing policies necessary to maintain institutional security.").

However, courts have also consistently recognized the "'frightening and humiliating' invasion' occasioned by a strip search, 'even when conducted with all due courtesy.'" *Byrd v. Maricopa Cnty. Sheriff's Dep't*, 629 F.3d 1135, 1143 (9th Cir. 2011); *see also Kirkpatrick v. City of Los Angeles*, 803 F.2d 485, 489-90 (9th Cir. 1986) ("[T]he fact that a strip search is conducted reasonably, without touching and outside the view of all persons other than the party performing the search, does not negate the fact that a strip search is a significant intrusion on the person searched ...." (citation omitted)); *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1446 (9th Cir. 1989) ("The feelings of humiliation and degradation associated with forcibly exposing one's nude body to strangers for visual inspection is beyond dispute."), *overruled by Bull*, 595 F.3d 964. Therefore, searches must be conducted only when connected to a "legitimate purpose." *Bell*, 441 U.S. at 558.

Courts have found that "routine" visual body cavity searches after contact visits do not violate prisoners' Fourth Amendment rights. *See id.* (policy requiring that pretrial detainees are required to expose their body cavities for visual inspection as a part of a strip search conducted after every contact visit with a person from outside the institution did not violate Fourth Amendment); *Souza*, 111 F.3d at 700 (plan to subject selected prisoners to drug screening and

body cavity search did not violate the Fourth Amendment). In a high security environment, the Ninth Circuit has found that "so long as a prisoner is presented with the opportunity to obtain contraband or a weapon while outside of his cell, a visual strip search has a legitimate penological purpose." *Michenfelder*, 860 F.2d at 332-33 (citations omitted). In assessing the constitutionality of a search policy, "[c]ourts owe corrections officials deference on the grounds that 'the realities of running a corrections institution are complex and difficult, courts are ill equipped to deal with these problems, and the management of these facilities is confided to the Executive and Legislative Branches, not to the Judicial Branch." *Bull*, 595 F.3d at 972 (quoting *Bell*, 441 U.S. at 547 n. 29).

Defendants argue that the objectives of the LASD search policy include controlling the intake of contraband into the facility and preserving the security and safety of both inmates and custodial personnel.[6] Mot. at 13, DUF 17. However, Plaintiff provides facts showing on numerous occasions, she was taken to CCB for a court date but had no contact with her attorney or any other non-LASD personnel.

Thus, the policy, as implemented, required visual body cavity searches even in instances when Plaintiff had no contact with outside personnel. Defendants argue that their searches prevent the introduction of contraband into the detention center, and Defendants noted in oral argument that even when a detainee has no contact with outside parties, any time a detainee is outside her cell she is exposed to other inmates or personnel and therefore could potentially receive contraband. Due to the strong interest in preventing the introduction of contraband into detention centers, and the requisite deference courts must give to jail officials' exercise of judgment, the Court finds the justification for the policy was not unreasonable. *See Bull*, 595 F.3d at 976 (systematic body cavity search policy of all arrestees was reasonable where the

---

[6] From the County's policies, it is unclear exactly when a visual body cavity search is to be conducted. The policy states that, "In accordance with state law, Penal Code section 4030, 'Strip or Body Cavity Search,' and federal appellate court decisions…once an inmate has been arraigned he may be subject to a strip or visual body cavity search for jail security or safety." Mathevosian Decl. Ex. A-18.

county produced undisputed evidence that implementation of more targeted policies "requires supervisory and line staff training" that "takes time away from other tasks and necessarily uses resources in scarce supply.").

### b.  Manner and Place

Plaintiff also argues that the searches on November 17, 23, and 29, 2011 were conducted in an unreasonable manner.

The strip searches conducted on Plaintiff were visual only and involved no touching. *See Souza*, 111 F.3d at 700 (citing *Michenfelder*, 860 F.2d at 332 (upholding visual body cavity searches); *Bonitz v. Fair*, 804 F.2d 164, 172–73 (1st Cir. 1986) (rejecting as unreasonable contact body cavity searches of female inmates conducted by police officers, without medical personnel, in non-hygienic manner and in presence of male officers). Additionally, the searches were conducted inside of Plaintiff's cell. *See Way*, 445 F.3d at 1160 (search inside a private room presented no issue as to how search was conducted). These facts weigh against finding the searches unreasonable.

In the Ninth Circuit, the Plaintiff "bears the burden of showing that [prison] officials intentionally used exaggerated or excessive means to enforce security." *Souza*, 111 F.3d at 700 (citing *Michenfelder*, 860 F.2d at 333).

Here, Plaintiff has presented evidence that, on the three days in question, Defendants used "exaggerated or excessive" means to conduct visual body cavity searches of Plaintiff through forcing the repetition of search procedures and chaining her to the cell door without access to her clothing.

Plaintiff has offered evidence that the strip searches involved exaggerated force through the Deputies' direction that Plaintiff repeat the procedure multiple times without providing instruction as to what she was doing incorrectly or how to properly conduct the search. Plaintiff has also provided evidence that the searches were conducted with a lack of professionalism. Shorter Decl. ¶ 5 (stating that, while she was chained naked to her cell, Defendant Avalos told Plaintiff she was "nothing" and mocked Plaintiff for being incarcerated). Plaintiff's evidence that she regularly and adequately followed these search procedures with other deputies suggests

that Defendants Avalos and Ortiz's insistence that she repeat the procedure multiple times in their presence, while verbally mocking her, may have been intentionally harassing or vindictive.

Moreover, on each of these occasions, after allegedly failing to adequately perform the search procedures, Plaintiff was chained to her cell door (in some instances without access to clothing) for an extended period and was deprived meals. On at least one occasion, a male employee approached Plaintiff while she was mostly naked, after she had been left without clothing for failing to properly perform a search. This method of obtaining compliance with the search policy appears both excessive and vindictive. It subjects the target of the search to degrading treatment without any indication that this method of obtaining compliance with the search procedures is rationally related to a legitimate objective. *See Turner*, 482 U.S. at 89 (court must consider the existence of a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it). Significantly, Defendants have presented no evidence regarding the efficacy of their methodology, or lack of availability of a less invasive method of obtaining their objective than fastening detainees naked to their cell doors. In oral arguments, Defendants argued that this procedure was necessary, but failed to specifically articulate how it helped to achieve any penological goal given that Plaintiff was alone in her cell at the time. Since Plaintiff's incarceration, Defendants have changed their policy regarding the procedure of chaining detainees to their cell doors, now limiting the maximum time that detainees may be chained to the door absent approval from a watch commander. Avalos Dep. at 27:9-14.

Thus, because Plaintiff has presented evidence that the manner of conducting the visual body cavity search on these three occasions exhibited exaggerated and excessive force, and was vindictive or harassing, there is a genuine issue of fact as to whether her rights under the Fourth Amendment were violated.

Although not addressed by the parties, the manner in which the searches were conducted also implicates the Fourteenth Amendment. *Lopez v. Youngblood*, 609 F. Supp. 2d 1125, 1140 (E.D. Cal. 2009). As there does not appear to have been a rational relationship between

chaining detainees to their cell doors and obtaining compliance with the search, Plaintiff has presented an issue of fact as to whether the policy violated the Fourteenth Amendment's prohibition on the punishment of pretrial detainees. *See supra*, Part III.A.1.

### 4. Medical Care

Plaintiff also claims that Defendants were deliberately indifferent to her medical needs. As noted above, although Plaintiff's claim arises under the Due Process Clause, "the eighth amendment guarantees provide a minimum standard of care for determining [her] rights as a pretrial detainee." *Jones*, 781 F.2d at 771. In order to state a claim for inadequate medical care under the Eighth Amendment, Plaintiff must show "deliberate indifference to serious medical needs." *Helling v. McKinney*, 509 U.S. 25, 32 (1993) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). "[A]ccidental or inadvertent failure to provide adequate medical care to a prisoner" is not sufficient. *Id.* This rule applies to "physical, dental, and mental health." *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982); *see also Hallett v. Morgan*, 296 F.3d at 744, 746-48 (9th Cir. 2002) (discussing prison officials' treatment of mentally ill inmates); *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (noting importance of providing dental care to prisoners).A determination of "deliberate indifference" involves an examination of two elements: the seriousness of the prisoner's medical need and the nature of the defendant's response to that need. "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992) *overruled on other grounds by WMX Technologies*, *Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (quoting *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)). "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *Id.* (quoting *Gamble*, 429 U.S. at 104). "The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a 'serious' need for medical treatment." *Id.*

at 1059-60 (9th Cir. 1992) (citing *Wood v. Housewright*, 900 F.2d 1332, 1337–41 (9th Cir. 1990) (citing cases); *Hunt*, 865 F.2d at 200–01.

Once the seriousness of the medical condition is established, the Court turns to whether the "deliberate indifference" standard can be met. *McGuckin*, 974 F.2d at 1060. To establish deliberate indifference, the plaintiff must show both (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006); *McGuckin*, 974 F.2d at 1060; *Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985) ("[M]ere delay of surgery, without more, is insufficient to state a claim of deliberate medical indifference; even if [plaintiff] were aware that surgery had been recommended when he brought the first action, he would have had no claim for deliberate medical indifference unless the denial was harmful.").

Here, Plaintiff raises two grounds for her medical treatment claim. First is Defendants' failure to test her blood and provide the proper dosage of her medication, Coumadin. Second is Defendants' refusal to permit Plaintiff to see a dentist.

### a. Blood Condition

To support her position that Defendants were deliberately indifferent to her blood condition, Plaintiff cites to *Wakefield v. Thompson*, 177 F.3d 1160, 164 (9th Cir. 1999). There, the Ninth Circuit found that the plaintiff adequately stated a § 1983 claim for the violation of his Eighth and Fourteenth Amendment rights, where the plaintiff alleged that the defendants were deliberately indifferent to his serious medical needs "by failing to provide him with the [psychotropic] medicine prescribed by [his doctor in prison], or to make any effort to obtain it for him" upon his release. *Id.* at 1163. The medication in question treated plaintiff's medical condition, which "render[ed him] prone to violent outbursts." *Id.* at 1162. After his release, he "suffered a relapse" which "led to a violent outburst and [plaintiff's] subsequent arrest. *Id.*

Without determining the admissibility of Plaintiff's medical evidence, the Court notes that Plaintiff provides the following facts by declaration.[7] According to Plaintiff, she suffered from pulmonary embolisms and deep vein thrombosis, and received treatment with a blood thinner, Coumadin.[8] Shorter Decl. ¶ 15. Defendants failed to test her blood until November 30, after putting her on a 7.5 mg dosage of Coumadin consistent with her prior dose. Shorter Decl. ¶ 16. After a nurse tested her blood and her INR appeared elevated, Coumadin was discontinued without informing Plaintiff. *Id*. ¶ 17.

Plaintiff asserts that her medical condition had latent effects. She states that, as a result of Defendants' failure to test her blood and discontinuing her medication, she "experienced severe anxiety and fear," in large part because she knew the condition for which she was not being treated rendered her susceptible to "blood clots, having a heart attack, stroke, or even death." Shorter Decl. ¶ 19. She also testifies that, on one occasion after getting her blood drawn, she bled for 45 minutes. *Id*. ¶ 18. After her release, although Plaintiff states that she was at an increased risk of blood clots due to her INR levels, no clots manifested. *Id* ¶ 20.

While Plaintiff may have had a serious medical condition meriting more diligent attention than Plaintiff actually received, she has presented no evidence that the lack of

---

[7] It appears that much of Plaintiff's evidence regarding her diagnosis and need for specific medical treatment would be inadmissible under Federal Rule of Evidence 702. *See, e.g.*, *Jacobs v. Woodford*, 2013 WL 322010, at *3 (E.D. Cal. Jan. 28, 2013) (a non-expert plaintiff is not personally permitted to testify as to any scientific conclusions regarding his medical condition). Plaintiff may, however, testify as to her own perceptions of what she felt like during her period of incarceration and what she told detention center staff. The Court need not reach a determination as to each specific piece of evidence, as, even considering all of the evidence, Plaintiff has not shown a constitutional violation.

[8] Defendants charge that Plaintiff "is not qualified to provide testimony regarding medical conditions of deep vein thrombosis and pulmonary embolisms" and why "certain medications are prescribed." Defs. Evid. Obj. (Dkt. 89) at 3. However, it is beyond reasonable dispute that Plaintiff suffered from these conditions; notably, her own inmate medical records state that she was "S/P DVT/PE," or, status post deep vein thrombosis/pulmonary embolisms. Mathevosian Decl. Ex. G ("Inmate Medical Records") at 1.

adequate treatment of this condition caused her measurable harm. She neither states that the denial caused her any physical pain, nor lays a proper foundation for establishing that any mental anguish she suffered was related to the denial of her medication.[9] *See Jett*, 439 F.3d at 1098 (delay in receiving medical care could be harmful where evidence showed that failure to set a fractured thumb caused a deformity); *Lolli v. Cnty. of Orange*, 351 F.3d 410, 420 (9th Cir. 2003) (finding a constitutional violation may take place when the government does not respond to the legitimate medical needs of a detainee whom it has reason to believe is diabetic, where the diabetic plaintiff is deprived of insulin and food, and where the plaintiff testifies that he was "feeling weak and was experiencing blurred vision," became "panicked" and "scared," and was "experiencing nausea and increased urination," symptoms which he associated with the beginnings of a ketoacidic condition). Therefore, the denial of treatment fails to rise to the level of a constitutional violation.

### b.  Dental Care

As to Plaintiff's dental care, Plaintiff presents evidence that, during her 32-day incarceration, despite numerous requests, she was never permitted to see a dentist.

The Eighth Amendment requires that prisoners be provided with a system of ready access to adequate dental care. *Hoptowit*, 682 F.2d at 1253. "Prison officials show deliberate indifference to serious medical needs if prisoners are unable to make their medical problems known to medical staff." *Id.*; *see also Hunt*, 865 F.2d at 200.

In *Hunt*, recognizing that "[d]ental care is one of the most important medical needs of inmates," the Ninth Circuit found that a delay in providing a prisoner with dental treatment, where the prisoner complained of a serious pain, could constitute an Eighth Amendment violation. *Hunt*, 865 F.2d at 200 (citing *Ramos v. Lamm*, 639 F.2d 559, 576 (10th Cir. 1980),

---

[9] Neither party has argued whether subjective anxiety about the perceived need for treatment amounts to a "harm" supporting a deliberate indifference claim. *McGuckin*, 974 F.2d at 1060. The Court need not decide the issue here, as there is no foundation for Plaintiff's risk of developing a latent condition, for example, through a doctor testifying that without medication there was a high probability that Plaintiff would suffer a heart attack.

*cert. denied*, 450 U.S. 1041 (1981); *Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985)).

> Hunt alleged that prison officials were aware that the loss of his dentures was causing him severe pain and resulting in permanent damage to his teeth. Specifically, he alleged that the prison officials were aware of his bleeding gums, breaking teeth and his inability to eat properly, yet failed to take any action to relieve his pain or to prescribe a soft food diet until new dentures could be fitted.

*Hunt*, 865 F.2d at 200. However, the court recognized that "delay in providing a prisoner with dental treatment, standing alone, does not constitute an eighth amendment violation," the plaintiff must also have suffered harm. *Id.*

Here, shortly after her incarceration began, Plaintiff claims that she "developed a very painful toothache." Shorter Decl. ¶ 23. She states that "almost every day throughout [her] entire incarceration," she told facility nurses she "needed to see a dentist." *Id.* After her release she "saw a dentist" and the tooth "eventually fell out." *Id.*

Plaintiff has presented facts sufficient to establish the existence of a serious condition. "The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment…or the existence of chronic and substantial pain are examples of indications that a prisoner has a 'serious' need for medical treatment." *McGuckin*, 974 F.2d at 1059-60. Although Plaintiff's dental injuries did not turn out to be life-threatening, persistent and significant dental pain over a several-week period is sufficient to establish a serious condition for the purposes of the Eight Amendment. *Id.*

Plaintiff also testifies that she reported the need to see a dentist daily and was ignored. "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they 'deny, delay, or intentionally interfere with medical treatment.'" *Hallett*, 296 F.3d at 744 (citing *Hamilton v. Endell*, 981 F.2d 1062, 1066 (9th Cir. 1992)). Plaintiff provides testimony that she asked to see a dentist almost daily, and was not permitted to do so, thus, extending her pain and

depriving her of treatment that potentially could have saved her tooth. She has therefore presented facts to show that she suffered harm as a result of the delay.

Defendants argue that Plaintiff's declaration "regarding medical diagnosis, necessary treatments and prescriptions" is inadmissible. Reply at 9. However, under Federal Rule of Evidence 701, a lay witness may testify as to opinions "rationally based on the witness's perception" that is not based on specialized knowledge. Therefore, Plaintiff may testify as to her own experience ("I was in pain"), but may not offer scientific conclusions regarding her medical conditions ("An infection caused my pain"). In her declaration, Plaintiff states that "she told the nurses" that "she had an infected tooth." Shorter Decl. ¶ 23. While this statement could not be admitted to establish the fact of the diagnosis, it nonetheless conveys that she imparted to the detention center staff that she was suffering from what she believed to be a serious medical condition. Her testimony is thus admissible for that purpose.

In sum, as to her dental care, Plaintiff has presented facts to suggest that (1) she suffered from a serious medical condition and (2) Defendants acted with deliberate indifference in denying her treatment, precluding summary judgment on the issue of whether Defendants violated Plaintiff's constitutional right to adequate medical care.

### 5.    Access to the Courts

Plaintiff also asserts that the County deprived Plaintiff of access to her attorney.

The Constitution guarantees prisoners meaningful access to the courts. *Bounds v. Smith*, 430 U.S. 817, 822 (1977). "A prisoner's right of access to the courts include contact visitation with his counsel." *Ching v. Lewis*, 895 F.2d 608, 610 (9th Cir. 1990). This right may be limited if prison officials can show that such limitations are "reasonably related to legitimate penological interests." *Casey v. Lewis*, 4 F.3d 1516, 1520 (9th Cir. 1993). However, a prisoner cannot claim a constitutional violation for lack of access to the courts unless he can show actual injury caused by the denial. *Lewis v. Casey*, 518 U.S. 343, 351 (1996).

Plaintiff has presented evidence that on multiple occasions during her incarceration, she asked to call her attorney, but was denied. Shorter Decl. ¶ 27. In addition, Plaintiff asserts that Deputy Ortiz confiscated her attorney's business card, thus further interfering with her ability to

communicate with counsel. *Id.* Finally, Plaintiff claims that she was not taken to the courtroom during multiple "dry runs." Shorter Decl. ¶¶ 10-11. Plaintiff has provided no evidence as to how these incidents actually harmed her or deprived her of meaningful access to the Courts. Therefore, her claim for lack of meaningful access to the courts fails and Defendants are entitled to summary judgment as to this theory.

### 6.    Excessive Force

Plaintiff claims that Defendants used excessive force on one occasion in pulling on her chains while she was allegedly not cooperating with a search.

The Due Process Clause protects pretrial detainees from the use of excessive force that amounts to punishment. *Graham v. Connor*, 490 U.S. 386, 395 n. 10 (1989). The Ninth Circuit applies the standards articulated in *Graham* to a pretrial detention excessive force claim. *Gibson v. Cnty. of Washoe, Nev.*, 290 F.3d 1175, 1197 (9th Cir. 2002).

Whether a Defendants use of force was "reasonable" under the Fourth Amendment "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake." *Gibson*, 490 U.S. at 396 (internal quotations omitted). This analysis requires "careful attention to the facts and circumstances in each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Gibson*, 290 F.3d at 1197 (citing *Graham*, 490 U.S. at 396*; Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)).

Plaintiff's excessive force claims rest on allegations that Deputy Avalos used excessive force in pulling on a chain resulting in a cut to Plaintiff's finger. Plaintiff has presented no evidence that the force employed was unreasonable. Plaintiff also did not address this claim in oral arguments. Therefore, Defendants are entitled to summary judgment as to this theory of liability.

### B.  Liability as to Individual Defendants

Here, Plaintiff has presented facts supporting three separate constitutional violations potentially giving rise to liability under § 1983. First, the inadequate classification procedures

and conditions of confinement in contravention of the Fourteenth Amendment Due Process Clause; second, the search procedures used by Defendants in violation of the Fourth and Fourteenth Amendments; and third, Fourteenth Amendment violations for deliberate indifference to Plaintiff's dental needs. The Court will now assess whether Plaintiff has presented sufficient facts to defeat summary judgment as to each individual defendant: the County, Sheriff Baca, acting in his official capacity, and Deputies Avalos and Ortiz.

### 1.    Los Angeles County

Generally, municipal liability under § 1983 may be based on (1) an express municipal policy, such as an ordinance, regulation, or policy statement; (2) a "widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a custom or usage' with the force of law"; or (3) the decision of a person with "final policymaking authority." *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 127 (1988) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68 (1970)) (widespread practice); *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–83 (1986).

The absence of an express policy limiting constitutional violations does not give rise to liability unless Plaintiff can establish that the absence expressed the County's deliberate indifference to the constitutional rights of pretrial detainees. Such expression-by-omission occurs only when the need for more or different action "is so obvious, and the inadequacy [of the current procedure] so likely to result in the violation of constitutional rights, that the policymakers ... can reasonably be said to have been deliberately indifferent to the need." *Oviatt By & Through Waugh v. Pearce*, 954 F.2d 1470, 1477-78 (9th Cir. 1992).

Whether the failure to train amounts to a constitution violation turns on whether "that training program is adequate; and if it is not,…whether such inadequate training can justifiably be said to represent 'city policy.'" *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989). Failure to adopt policies necessary to prevent constitutional violations may also rise to the level of deliberate indifference. *See, e.g.*, *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992) ("[T]he decision not to take any action to alleviate the problem of detecting missed arraignments constitutes a policy for purposes of § 1983 municipal liability."). "Whether a local

government entity has displayed a policy of deliberate indifference is generally a question for the jury." *Oviatt By & Through Waugh v. Pearce*, 954 F.2d 1470, 1478 (9th Cir. 1992) (citing *Davis v. Mason County*, 927 F.2d 1473, 1482 (9th Cir.), *cert. denied*, 502 U.S. 899 (1991)).

Plaintiff alleges, generally, that the County cannot avoid liability for the above-described constitutional violations "simply because some written policies governing the subject matter of Ms. Shorter's claims exist." Opp'n at 19. There are two bases Plaintiff asserts for municipal liability. First, Plaintiff argues there are issues of fact as to whether the County, through it actual policies and customs, caused the constitutional violations at issue. Opp'n at 19 (citing *Monell*, 436 U.S. at 694-95). Second, Plaintiff asserts that there is evidence that the County's policies were grossly inadequate and the County failed to train its officers on written policies, thus amounting to deliberate indifference to Plaintiff's constitutional rights. *Id.* at 20.

Plaintiff points primarily to two pieces of evidence to support its assertion that a municipal policy or custom existed to violate constitutional rights. First, Plaintiffs fault the County's failure to promulgate any policy limiting the length of time inmates could be chained naked to their cell doors during a body cavity search. Second, Plaintiffs point to the fact that deputies had unfettered discretion as to how often an inmate showered, received recreation time, and were fed.

Plaintiff argues that a comprehensive failure to adequately train deputies, in addition to a failure to promulgate policies to prevent constitutional abuses, constituted a municipal policy. To establish the County's failure to adopt procedures necessary to prevent constitutional violations, Plaintiff relies on the Report by the Citizens' Commission on Jail Violence, Opp'n at 20; Lee Decl. Ex. 6 ("CCJV Report") and a letter from the Department of Justice regarding mental health care and suicide prevention at the LA County Jails ("DOJ Letter"). Kwasniewsk Decl. (Dkt. 95) ¶ 5, Ex. D.

### a. The CCJV Report

The Los Angeles County Board of Supervisors (the "Board") formed the Citizens' Commission on Jail Violence ("CCJV") in response to mounting criticism against Sheriff Leroy Baca and the Los Angeles County Sheriff's Department ("LASD"). Specifically, the CCJV was

tasked with two primary objectives: (1) "to conduct a review of the nature, depth and cause of the problem of inappropriate deputy use of force in the jails, and to recommend corrective action as necessary"; and (2) to "'hold [the Board] and the Sheriff accountable for their speedy and effective implementation' of necessary reforms." CCJV Report at 2. After completing its investigation, the CCJV issued a final report on September 28, 2012.

### b. Evidentiary Objections to the CCJV Report

Defendants object to admission of the CCJV Report. Defs. Evid. Objs. at 6. Specifically, they argue that (1) the report is not authenticated and lacks foundation under Federal Rule of Evidence 901, and (2) that the document is offered for the truth of the matter asserted and thus constitutes inadmissible hearsay under Federal Rule of Evidence 801.

Under Federal Rule of Evidence 901, evidence that a public record or report is from the public office where items of that nature are kept satisfies the requirement that admitted evidence be authenticated. *Premier Nutrition, Inc. v. Organic Food Bar, Inc.*, 2008 WL 1913163, at *5 (C.D. Cal. Mar. 27, 2008) *aff'd*, 327 F. App'x 723 (9th Cir. 2009).

Here, Ms. Lee declares, under penalty of perjury, that she attached "true and correct copies of excerpts from the *Report of the Citizens' Commission on Jail Violence* published by the Citizens' Commission on Jail Violence." Lee Decl. ¶ 7. She also states that she obtained the report directly from the Los Angeles County Government website: http://ccjv.lacounty.gov/reports. The printout also bears "distinctive characteristics" of the County's website, specifically, the County Seal. CCJV Report at 1; *Haines v. Home Depot U.S.A., Inc.*, 2012 WL 1143648, at *7 (E.D. Cal. Apr. 4, 2012) ("courts have considered the 'distinctive characteristics' of the website in determining whether a document is sufficiently authenticated." (citations omitted)). The report, obtained from the County's website, is properly authenticated under Rule 901.

Moreover, Rule 902 allow for the self-authentication of certain documents, including official publications: "Books, pamphlets, or other publications purporting to be issued by public authority." Fed. R. Evid. 902(5); *Paralyzed Veterans of Am. v. McPherson*, 2008 WL 4183981, at *7 (N.D. Cal. Sept. 9, 2008). Federal courts routinely consider records from government

websites to be self-authenticating. *See, e.g.*, *Estate of Gonzales v. Hickman*, 2007 WL 3237727, at *2 (C.D. Cal. May 30, 2007); *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 551 (D. Md. 2007) ("Given the frequency with which official publications from government agencies are relevant to litigation and the increasing tendency for such agencies to have their own websites, Rule 902(5) provides a very useful method of authenticating these publications. When combined with the public records exception to the hearsay rule, Rule 803(8), these official publications posted on government agency websites should be admitted into evidence easily."); *U.S. ex rel. Parikh v. Premera Blue Cross*, 2006 WL 2841998, at *4 (W.D. Wash. Sept. 29, 2006) (considering documents that can be found on Government websites, such as GAO Reports and Health and Human Services' Reports self-authenticating).

Here, the CCJV Report is available to the public at a Los Angeles County government website, and bears the seal of the County of Los Angeles. The report was commissioned by the Board. Thus, this report is an "Official Publication" under Rule 902(5).

Accordingly, the CCJV Report is properly authenticated.

Defendants also assert that the report is inadmissible hearsay. Defs. Ev. Obj. at 6.

Generally an out of court statement offered for the truth of the matter asserted is considered hearsay and is inadmissible. Fed. R. Evid. 801, 802. However, Federal Rule of Evidence 803(8) excludes from the rule against hearsay "a record or statement of a public office" if it includes "factual findings from a legally authorized investigation" where the opposing party "does not show that the source of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8). Therefore, factual determinations in government reports, whether they contain facts, opinions, or both, are admissible under this exclusion. *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 164 (1988) ("the language of the Rule does not create a distinction between 'fact' and 'opinion' contained in such reports" and the legislative history of the rule "contain[s] no mention of any dichotomy between statements of 'fact' and 'opinion' or 'conclusions.'"). Thus, the Court may presume "that the tendered public records are trustworthy" and the "burden of establishing a basis for exclusion falls on the opponent of the evidence." *Johnson v. City of Pleasanton*, 982 F.2d 350, 352 (1992).

In this case, the CCJV Report appears to fall within the public records heresay exclusion as it documents factual findings from a legally authorized investigation. *See, e.g.*, *Montiel v. City of Los Angeles*, 2 F.3d 335, 341 (9th Cir. 1993) (holding that the district court should have presumed the Report of the Independent Commission on the Los Angeles Police Department, i.e. the Christopher Commission Report, was trustworthy, which the defendant could challenge); *Gilbrook v. City of Westminster*, 177 F.3d 839, 858 (9th Cir. 1999) (holding that a report prepared by the city's Financial Review Committee was properly admitted because defendants produced no evidence to raise doubts as to the reliability of the report); *U.S. v. Lewis*, 27 Fed. Appx. 768, 769 (9th Cir. 2001) (finding that the District Court should have admitted the Shooting Review Board Report). Nor does the fact that the CCJV Report includes recommendations or opinions exclude it from Rule 803(8). The burden is on the Defendants to raise any issues as to the Report's trustworthiness.

Significantly, Defendants do not dispute *any* of the facts contained within the CCJV Report. Indeed, the County's 30(b)(6) witness confirmed in her deposition that the County itself adopted the findings of the Report and implemented policy changes in response to it. Walton Dep. at 175:10-16.

Accordingly, Defendants evidentiary objections to the admissibility of the CCJV report are OVERRULED without prejudice to raise issues of trustworthiness at trial.[10]

### c.  Analysis

Defendants assert that they had sufficient municipal policies in place to preclude liability under *Monell* for Plaintiff's claims.

Plaintiff has proffered evidence that there was an official policy of chaining detainees to their cell doors, with no time limitation. Ortiz Dep. at 42:5-9. There is also evidence to show

---

[10] The same substantive analysis applies to Defendants evidentiary objections to the DOJ letter "reporting its conclusions with regard to Los Angeles County's compliance with the Memorandum of Agreement ('MOA') that requires adequate mental health care and suicide prevention at the Los Angeles County Jail System." DOJ Letter at 1. Those objections are likewise OVERRULED.

that under existing policy, deputies had significant discretion over the amount of recreation time detainees would receive and whether detainees had access to the showers. Ortiz Dep. at 53:17-19; Walton Dep. at 101:6-12.

Moreover, evidence supports the inference that the County was "deliberately indifferent" to the right of detainees to be free from unreasonable visual body cavity searches. First, County policy allowed for detainees to be chained to their door. Second, County jail officials used strip searches as a tool to harass inmates accused of minor infractions. CCJV Report at 42. Third, "the unacceptable, unsanitary, and unsafe conditions at [county jails], including the punitive nature of suicide precautions, are exacerbated by inappropriate and unprofessional behavior by deputies." DOJ Letter at 14-15. Fourth, the County's training policies fell well below industry standards. CCJV Report at 122. Considering these facts, summary judgment in favor of the County as to violations of Plaintiff's Fourth Amendment rights is inappropriate.

There is also an issue of fact as to whether the County was deliberately indifferent to Plaintiff's due process right (1) to be free from punitive conditions of incarceration, and (2) to adequate procedures before being classified as mentally ill. First, evidence shows that in HOH, deputy discretion allowed for detainees to go weeks without showering and enjoy little to no recreation time. Second, there is evidence that systemically "prisoners have inadequate access to recreation on many high observation housing units. Prisoners who exhibit mental illness are frequently housed in their own single cells." DOJ Letter at 15. Third, the jails do not obtain or disseminate complete mental health information upon intake, and have failed to comply with stipulated procedures regarding mental health procedures related to intake. DOJ Letter at 7-9, 26. Given the lack of adequate training and procedures confirmed by the CCJV Report and the DOJ Letter, a reasonable juror could infer that the County knew, and simply did not care, that deputies were abusing their discretion creating unconstitutional living conditions, that the procedures themselves were constitutionally deficient, and inmates were being deprived of appropriate procedures in their classification as mentally ill.

For similar reasons, a jury could conclude that denial of dental treatment resulted from a failure to train nurses or staff in HOH as to the applicable polices. The letter from the DOJ

noted that "poor supervision means that prisoners were often unable to access medical care in a timely manner." DOJ Letter at 10. Therefore, the Court concludes there is an issue of fact as to municipal liability regarding the violations of each of Plaintiff's constitutional rights.

### 2.      Sheriff Leroy Baca

Plaintiff also seeks to hold Sheriff Leroy Baca liable under a supervisory liability theory.

Generally, a "[g]overnment official, his or her title notwithstanding, is only liable for his or her own misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). However, supervisors may be held liable for the actions of their subordinates in certain circumstances: (1) for setting in motion a series of acts by others, or knowingly refusing to terminate a series of acts by others, which they knew or reasonably should have known would cause others to inflict constitutional injury; (2) for culpable action or inaction in training, supervision, or control of subordinates; (3) for acquiescence in the constitutional deprivation by subordinates; or (4) for conduct that shows a "reckless or callous indifference to the rights of others." *al-Kidd v. Ashcroft*, 580 F.3d 949, 965 (9th Cir. 2009) (citing *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991)), *rev'd and remanded*, 131 S. Ct. 2074 (2011). "[W]hen a supervisor is found liable based on deliberate indifference, the supervisor is being held liable for his or her own culpable action or inaction, not held vicariously liable for the culpable action or inaction of his or her subordinates." *Starr*, 652 F.3d at 1207.

Plaintiff argues that Sheriff Baca is liable for the same reasons as the County. The CCJV Report and DOJ investigation go to show that Baca was aware of unconstitutional conditions in his jails and failed to take action to ensure that policies were implemented to prevent the mistreatment of prisoners. Plaintiff therefore has evidence to show Sheriff Baca was the "final policy-maker for all jail policies and was ultimately responsible for deciding the appropriate departmental response" to reports of misconduct. *Fuller v. Cnty. of Orange*, 276 F. App'x 675, 679 (9th Cir. 2008) (reversing the granting of summary judgment as to official capacity claims against the county sheriff where a report "detailed concerns regarding the use of force by jail personnel during the time period relevant to the instant case."). Thus, summary judgment as to claims against Sheriff Baca in his official capacity is inappropriate.

### 3.    Deputies Avalos and Ortiz

As laid out above, Plaintiff has presented facts sufficient to allege a violation of her constitutional rights under the Fourth and Fourteenth Amendments. As is relevant to Defendants Avalos and Ortiz, Plaintiff has raised an issue of fact as to whether the officer's conduct in searching Plaintiff on three occasions violated her Fourth Amendment rights. *Supra* Part III.A.3.b. Plaintiff has presented facts that indicate Defendants' Avalos and Ortiz forced Plaintiff to repeat searches multiple times, withheld her clothing, and verbally antagonized Plaintiff in violation of Plaintiff's Fourth Amendment rights.

Defendants claim that Deputies Avalos and Ortiz are protected from liability under § 1983 for the purported Fourth Amendment violation through the doctrine of qualified immunity. The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson*, 555 U.S. at 231. The Supreme Court has established a two-part framework for determining an official's entitlement to qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The Court must assess whether the facts alleged show that an officer's conduct violated a constitutional right. *Id.* In addition, the Court must assess whether the constitutional right was clearly established. *Id.* The court must conduct this inquiry in light of the specific context of the case, not as a broad general proposition. *Id.* The Court may address whether the constitutional right was clearly established without first addressing whether the conduct violated a constitutional right. *Pearson*, 555 U.S. at 241-42.

"If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Saucier*, 533 U.S. at 195. Even if the law is clearly established, "[i]f the officer's mistake as to what the law requires is reasonable…the officer is entitled to the immunity defense." *Id.*

In the Ninth Circuit, it is well established that strip searches that are "excessive, vindictive, harassing, or unrelated to any legitimate penological interest" may violate the Fourth Amendment. *See Michenfelder*, 860 F.2d at 332-33. It is also beyond refute that the conduct of

strip searches demands special attention to professionalism and decorum, as "the scope of the intrusion here is … a 'frightening and humiliating' invasion." *See Way*, 445 F.3d at 1160. Thus, in light of the context of this case, any reasonable deputy would know that performing a search in a harassing and unprofessional manner violated the Fourth Amendment.

Here, Defendants do not dispute that the right to be free from harassing and vindictive searches is an established right under the Fourth Amendment. Instead, they argue that based on the facts alleged, a reasonable corrections officer would not know that these searches were "excessive," "vindictive," or "harassing." This is a factual question appropriate for resolution by a jury. A reasonable jury could consider Plaintiff's testimony that she had performed the searches properly in the past to conclude that the Deputies insistence that Plaintiff repeat the procedure multiple times amounted to a "harassing" body cavity search.

Therefore, the Court concludes that the state of the law in 2011 gave Defendants "fair warning that their alleged treatment of [Plaintiff] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). As such, Defendants Avalos and Ortiz are not entitled to qualified immunity as to Plaintiff's claim premised on violations of the Fourth Amendment.

### C. State Law Claims

Plaintiff also raises state law claims for negligent and intentional infliction of emotional distress, defamation, assault and battery, negligent hiring and supervision, and negligence. Defendants do not address the claims individually, but makes two arguments as to why all the state law claims should be dismissed: (1) that Defendants are immune to all liability arising out of Plaintiff's incarceration under California Government Code §§ 844.6 and 845.6 and (2) the Complaint does not comply with the Government Claims Act, Cal. Gov't Code §§ 945.4, 950.2.

Section 844.6 of the California Government Code provides that, absent an exception, a public entity is not liable for an injury to any prisoner. Cal. Gov't Code § 844.6. But "[n]othing in this section exonerates a public employee from liability for injury proximately caused by his negligent or wrongful act or omission." Cal. Gov't Code § 844.6.

California Government Code § 845.6 provides that:

> Neither a public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody; but … a public employee, and the public entity where the employee is acting within the scope of his employment, *is liable if the employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care*.

(emphasis added).

Defendants have failed to address these exceptions specifically, and it appears that Plaintiff's state law claims (for negligent and intentional infliction of emotional distress, defamation, assault and battery, negligent hiring and supervision, and negligence) could fall within the exceptions. Therefore, the Motion for Summary Judgment, insofar as it is based on immunity under these sections, is DENIED.

Under California Government Code § 945.6, if the public entity gives written notice of the claim, "any suit brought against a public entity" must be commenced no more than six months after notice is personally delivered or deposited in the mail. Cal. Gov. Code, § 945.6 (a)(1). The deadline "is a true statute of limitations defining the time in which, after a claim presented to the government has been rejected or deemed rejected, the plaintiff must file a complaint alleging a cause of action based on the facts set out in the denied claim," *Lopez v. Cate*, 2015 WL 1293450, at *13 (E.D. Cal. Mar. 23, 2015) (citing *Shirk v. Vista Unified Sch. Dist.*, 42 Cal. 4th 201, 209 (2007), *as modified* (Oct. 10, 2007)).

A civil action is "commenced" by filing a complaint with the court. Cal. Code Civ. Proc. § 411.10. A complaint is considered filed when it is placed in possession of the clerk of the court. *Baker v. La Cumbre Mgmt. Co.*, 9 F. App'x 752, 752 (9th Cir. 2001) (citing *Cintron v. Union Pac. R.R. Co.*, 813 F.2d 917, 920 (9th Cir. 1987)).

In the FAC, Plaintiff indicates that her claim for damages was denied by the Los Angeles County Board of Supervisors on February 28, 2012. Plaintiff lodged her complaint, along with her request to proceed *in forma pauperis*, on August 27, 2012 (Dkt. 1). Her *in forma*

*pauperis* request was granted, and the complaint was officially filed on September 4, 2012 (Dkt. 3). As such, Plaintiff has complied with § 945.6. She filed her complaint on August 27, 2011, within the six-month deadline after the rejection of her claim.

On this basis, the Motion for Summary Judgment as to Plaintiff's state law claims is likewise DENIED.

## IV.   DISPOSITION

As articulated above, the Court DENIES in substantial part Defendants' Motion for Summary Judgment. In summary:

- Plaintiff has presented facts to preclude summary judgment as to violations of her Fourth and Fourteenth Amendment rights, arising from her conditions of confinement, classification as mentally ill, deprivation of dental care, and invasive searches, giving rise to § 1983 liability against the County and the Sheriff.

- Plaintiff has presented facts to preclude summary judgment as to liability against the County under *Monell* and supervisor liability as to Sheriff Baca as to her Fourth  and Fourteenth Amendment rights.

- Plaintiff has presented facts to preclude summary judgment as to violations of her Fourth Amendment rights as to Defendants Avalos and Ortiz; and has shown those defendants are not entitled to qualified immunity as her Fourth Amendment rights were clearly established at the time of the alleged constitutional violation.

- Defendants Motion is DENIED as to Plaintiff's state law claims

However, in so far as Plaintiff's § 1983 claims are based upon denial of medical care for her blood condition, access to the courts, or excessive force, the Motion for Summary Judgment is GRANTED.

DATED:  April 21, 2015

*David O. Carter*

—————————————————————
DAVID O. CARTER
UNITED STATES DISTRICT JUDGE