**LECIA L. SHORTER**
287 S. Robertson Blvd., Suite 291
Beverly Hills, CA   90211
Tel:   (310) 869-5835
*leciashorter@yahoo.com*

**Plaintiff In Pro Per**

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LECIA L. SHORTER, an individual, | Case No.:  2:12-cv-07337-DOC-GJS |
| Plaintiff, | **AMENDED DECLARATION OF LECIA L. SHORTER RE IRREGULARITIES IN TRIAL PROCEEDINGS, JUROR MISCONDUCT, WITNESS INTIMIDATION AND NON-VERBAL COMMUNICATION BETWEEN DEFENSE COUNSEL AND JUROR NO. 10** |
| vs. | |
| LEROY BACA, et al., | |
| Defendants. | |

AMENDED DECLARATION OF LECIA L. SHORTER - 1

## DECLARATION OF LECIA L. SHORTER

I, Lecia L. Shorter, do hereby declare as follows:

1.      I am the plaintiff in the above-entitled matter. This declaration is submitted to apprise the court that I will no longer participate in these proceedings due to the unfair and biased matters that have transpired as set forth below.  Matters which I believe have violated my constitutional right to Due Process and Equal Protection of the Laws which require a fair proceeding before a fair and impartial judicial officer. I have personal knowledge of the matters stated herein and if called as a witness could and would competently testify thereto.

2.      On March 7, 2023, a U.S. Marshal presented to Court and indicated that he did not serve my witness, Dr. Osita Onugha, because I never gave their office a subpoena for him.  I tried to state on the record that it was my recollection that I did provide a subpoena and returns of service to their office on or about January 30, 2023, although I could have been mistaken.  See Exhibit One attached hereto. As I tried to explain this to the Court, I was cut off and not allowed to speak. Because I did not have copies of the subpoenas with me, the court clerk graciously prepared a new subpoena and issued it as well.  The Marshal's office served him that day.

2.      During the entire month of February, I made numerous attempts to contact the Marshal's office to determine the status of my subpoenas so I could know who had been served and who had not been served.  The Marshal's office ignored me and would not respond to my email or telephone inquiries. The trial began and I had no idea of many of my witnesses who had been served and those who had not so I could have had the witness served independent of the Marshal's office. Had the Marshal's responded to my inquiries, the matter of service of Dr. Onugha could have been resolved before the first day of trial.

AMENDED DECLARATION OF LECIA L. SHORTER - 2

3.      On March 9, 2023, Dr. Onugha made contact with either the Marshal's office or the Court and asked whether he could appear for court via zoom.  The subpoena he was served clearly stated that if he had questions about the subpoena or his appearance he should contact me.  Instead, he communicated with either the court or the U.S. Marshal's office and asked whether he could appear via zoom. There needs to be clarity on the record about who Dr. Onugha spoke with concerning his request to appear via zoom and whether any additional matters were discussed.

4.      On March 10, 2023, Dr. Onugha testified via Zoom.  In my witness list, I indicated that Dr. Onugha would testify about being my surgeon in 2018 and the causes and factors that contributed to Plaintiff's lung injuries in 2018.  When I attempted to exam Dr. Onugha about whether my lung injuries in 2010 related to my lung injuries in 2018, the District Court stopped and indicated that I was precluded from asking questions about my lung injuries in 2010. The District Court precluded my inquiry about 2010 but he allowed the defense to ask Dr. Onugha whether my 2010 injuries could have possibly related to my injuries in 2018 with establishing or identifying those injuries to Dr. Onugha.  Following the mindset of the Court, Dr. Onugha testified that it was impossible for my lung injuries, the entirety of which was unknown to him, in 2010 related to my lung injuries in 2018.

5.      After the jury was selected, Judge Carter told the jurors a story about a study or a course he participated in about jurors and the process of juror deliberations. He told the jurors how interesting he found it that jurors who constantly discussed the case amongst themselves during the trial, even though they weren't supposed to, often reached the right decisions and jurors who did not discuss the case didn't reach the right decision.  This was in my opinion an inappropriate subliminal message to the jury that they should discuss the case amongst themselves during the proceedings so they could reach the right decision.

AMENDED DECLARATION OF LECIA L. SHORTER - 3

6.      In its Order Re Motions in Limine and Pre-Trial Settings [Dkt #535], the District Court cited *Torres v. City of Santa Clara*, 2014 WL 4145509, at *2 (N.D. Cal. Aug. 20, 2014) ("Absent additional facts that the prior encounters involved similar facts or are otherwise probative to the damages inquiry, the Court is persuaded that, under Rule 403, the unfair prejudice from this prior bad act evidence is simply too great."); see also *Hammonds v. Greyhound Bus Co*., No. EDCV 15-1036 SS, 2017 WL 10545393, at *7 n. 7 (C.D. Cal. Apr. 19, 2017) ("Courts routinely preclude evidence of prior incarcerations and convictions as more prejudicial than probative").  [Dkt #535, p. 4].

7.      Throughout the trial, Defense counsel has been allowed to barrage me with numerous questions about every civil and criminal matter from 2008 to the present that Plaintiff has ever been involved for the sole purpose of biasing the jury against Plaintiff instead of focusing of Plaintiff's physical and emotional injuries.  The cross-examination was in violation of Rule 404 of the Federal Rules of Evidence 404 which prohibits the introduction of circumstantial character evidence.  The Notes on Advisory Committee on Proposed Rules states:  "Character evidence is of slight probative value and may be very prejudicial. It tends to distract the trier of fact from the main question of what actually happened on the particular occasion. It subtly permits the trier of fact to reward the good man to punish the bad man because of their respective characters despite what the evidence in the case shows actually happened."  It is evident that the jury has been extremely prejudiced as shown with their physical gestures and expressions that its focus has shifted from assessing the issue of damages to wanting to punish because I am perceived as a bad person.

8.      The cross-examination of civil and criminal cases dating back to 2008 to 2019 has also been allowed in violation of Rule 404 which provides "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by

AMENDED DECLARATION OF LECIA L. SHORTER - 4

a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Defendants' presentation was cumulative and a waste of time. It did not focus the jury on the issue of compensatory and punitive damages because the Ninth Circuit has already twice decided the issue of liability as a matter of law. For this and other reasons, it is impossible for me to have a fair decision.

Additionally, the examination of Plaintiff's civil and criminal histories were specifically precluded in this Court's Order Re Motions in Limine and Pre-Trial Settings [Dkt #535] granting Plaintiff's Motion in Limine No. 3 wherein the Court stated "In *Seals the v. Mitchell*, 2011 WL 1399245 (N.D. Cal. Apr. 13, 2011), the Court excluded evidence of the plaintiff's other prison grievances and lawsuits, explaining that "[t]he charge of litigiousness is a serious one, likely to result in undue prejudice against the party charged, unless the previous claims made by the party are shown to have been fraudulent . . . ." *Id.* at *5 (quoting *Outley v. City of New York*, 837 F.2d 587, 592 (2d Cir. 1988)). Defendants here do not show that Plaintiff's claims in other lawsuits were fraudulent. Accordingly, Plaintiff's MIL 3 is GRANTED." This Court violated its own order by allowing defense counsel to extensive question Plaintiff about civil and criminal that range from 2008 to the present.

9.    I attempted to counter defense counsel's cumulative evidence of past civil and criminal matters with testimony of my true character by explaining that my family are foundational Black Americans who have made significant contributions to this country and our communities throughout the nation. When I mentioned that my father was a Korean war veteran who received three medals of honor for bravery, Judge Carter cut me off and told me the testimony about my family was

AMENDED DECLARATION OF LECIA L. SHORTER - 5

inappropriate.  However, he did not cut me off when I questioned Defendants Avalos and Ortiz about their family.

Furthermore, this Court specifically excluded all of my witnesses and exhibits that would explain the LASD deputy gang culture that exists inside of Los Angeles County jails.  Specifically, this Court excluded the testimony of

a. Defendant Leroy Baca:  Mr. Baca was expected to testify about his enforcement (or lack thereof) of LASD policies, his oversight of the CRDF, and his actions, if any, upon receiving Plaintiff's administrative complaint about the events of 2011.

b.  Sgt. Vanessa Chow who would have testified about the history gang activity and inmate abuse within LASD including but not limited to the wife of Sheriff Villanueva and deputy sheriffs.

c.  Former Chief LaJuana Haselrig who was expected to testify about LASD gang activity, deputy abuse of inmates, racial discrimination within LASD, lack of investigations for LASD deputy misconduct, dishonesty, and cover-ups.

d.  Former Chief LaJuana Haselrig who was expected to testify about LASD gang activity, deputy abuse of inmates, racial discrimination within LASD, lack of investigations for LASD deputy misconduct, dishonesty, and cover-ups.

e.  Daniel Vasquez, Plaintiff expert in the 2015 trial, was expected to testify about his expert opinions on constitutional policing and correctional practices as applied to the facts of this case.

f.  Sean Kennedy is a current Commissioner on the Civil Commission on Jail Violence and an expert on Los Angeles Sheriff Department gangs and cliques and how those subgroups foster a culture, with the knowledge and consent of present and former L.A. Sheriffs, that resists police reforms, such as community policing and constitutional policing, by encouraging and even celebrating aggressive tactics and excessive use of force against minority communities.  Mr. Kennedy is also an

AMENDED DECLARATION OF LECIA L. SHORTER - 6

expert in the failures in oversight of jail practices by Los Angeles Sheriffs.  He has authored a report on the 50 year history of deputy gangs in LASD.

g.  Max Huntsman is the Inspector General of Los Angeles County and will testify about his report which documents unlawful conduct by the Los Angeles Sheriff's Department and the efforts of LASD to remove reform and oversight since the convictions of Leroy Baca and Paul Tanaka.  Mr. Huntsman was expected to testify about the misconduct of LASD including but not limited to sexual harassment of female inmates, unconstitutional body cavity searches and mistreatment of Black American female inmates by sheriff deputies.

h.  Brian K. Williams is the Executive Director, Los Angeles County Sheriff Civil Oversight Commission.  Mr. Williams was expected to testify about the Commissions various reports and investigations concerning inmate abuse and mistreatment at Los Angeles County jail facilities by members of the Los Angeles Sheriff's Department.

i.  Corene Kendrick is deputy director of the ACLU National Prison Project. She was expected to testify about Los Angeles County Jails and LASD failures re the most basic minimum standards of sanitation, health care, and human decency to people detained there.

j.  Cerise Castle is an independent investigative reporter who has done extensive research and investigations concerning unconstitutional policing by the LASD.  She was expected to testify about the results of her many investigations of LASD Deputy Gangs and inmate abuse.

k.  LASD Deputy Ronald Brock is a former deputy sheriff.  He was expected to testify about unconstitutional policies and practices of LASD including but not limited to deputy gangs, racial discrimination, unconstitutional body cavity searches and inmate abuse by LASD sheriff deputies.

AMENDED DECLARATION OF LECIA L. SHORTER - 7

l. 24. Lindsay Battles – lead attorney for the class plaintiffs in Amador v. Baca, 2:10-cv-01649. Ms. Battles will testify about the long-standing unconstitutional practices by the Los Angeles Sheriff's Department of humiliating, invasive body cavity searches upon female inmates, excessive force, sexual harassment and abuse and conditions of confinement against female inmates at Century Regional Detention Facility.

m. Mark Ridley-Thomas is a former member of the Los Angeles County Board of Supervisors from 2008 to 2020. He is a named party to this action who was unintentionally dismissed without Plaintiff's knowledge or consent. Plaintiff believed he had been served the summons and complaint and appeared thru the attorneys of record for Defendants. Mr. Ridley-Thomas was expected to testify about why he sponsored a bill to create the Office of Inspector General in an effort to detect and prevent fraud, waste and abuse in government agencies and particularly the Los Angeles Sheriff's Department (LASD). Mr. Ridley-Thomas was also expected to testify about the creation of the Civilian Oversight Commission, the responsibility of the Board of Supervisors to oversee Los Angeles County jails; LASD history of deputy gangs; Board handling of complaints against LASD by female inmates and others; funds expended for judgments and settlements due to misconduct by LASD and, issues with oversight and accountability of former Sheriff Leroy Baca. Mr. Ridley-Thomas was also expected to testify about the deliberate indifference of the individual board members deliberate indifference to the complaint of Plaintiff concerning the unconstitutional body cavity searches she endured as well as the conditions of confinement. Plaintiff's complaints were never investigated by the Board of Supervisors. Instead, they have fought her for 12 years for matters which have twice been deemed unconstitutional by the Ninth Circuit. Mr. Ridley-Thomas has approved millions of dollars in attorney's fees and costs to fight Plaintiff's efforts

AMENDED DECLARATION OF LECIA L. SHORTER - 8

to secure justice.  Since the County is a defendant in this matter, Plaintiff wanted to

examine Mr. Ridley-Thomas about his failures in the oversight of Los Angeles

County jails but she was denied while defense counsel was allowed to barrage

Plaintiff with a series of questions related to civil and criminal lawsuits.

n. Holly Mitchell is current member of the Los Angeles County Board of

Supervisors.  Ms. Mitchell was expected to discuss the history of LASD deputy

gangs and the current status of deputy gangs within LASD; the Board's efforts to

correct and rectify and curtail unconstitutional practices against female inmates;

the state of L.A. County jails currently versus 2010 and why women are still being

victimized at Century Regional Detention Facility; and, the Board's historical

problems with oversight of jails and Sheriff's Baca and Villanueva.  Ms. Mitchell

has also approved millions of dollars to pay for attorneys fees and expenses related

to this matter.

In addition to the foregoing, this Court granted Defendants' Def.'s MIL 1 to

Exclude Evidence of Reports, Documents, and Declarations regarding the Los

Angeles County Sheriff's Department (Dkt. 458).  [Dkt #535, p. 8].

This Court correctly noted that "Plaintiff contends that these reports,

documents and declarations investigating or discussing the Los Angeles County

Sheriff's Department are relevant, because these "acts, wrongdoings, and crimes of

the LASD serves to present the jury with a cohesive, complete, and

comprehensible story of the nearly 50-year history of corruption with LASD and

the silent acquiescence of the Los Angeles County Board of Supervisors." (Dkt.

481) at 3. Specifically, Plaintiff contends that "the lawsuits, millions of dollars in

settlements, the prosecution of former Sheriff Leroy Baca, his undersheriff Paul

Tanaka, and, the indictment and convictions of 18 sheriff deputies" are relevant.

*Id.*

AMENDED DECLARATION OF LECIA L. SHORTER - 9

Plaintiff was denied the foregoing evidence but Defendants were allowed to present extremely prejudicial information concerning Plaintiff's litigation history from 2008 to the present.

Additionally, this Court granted Defendants MIL No. 3 to exclude Plaintiff's Exhibit Nos. 24-40, 63-69, 75,79-80, 83-113, "noting that they are irrelevant and were not admitted at the previous trial. Plaintiff opposes, arguing that the exhibits are relevant to Plaintiff's punitive damages because they show that "Defendant Baca and the County of Los Angeles never engaged in meaningful reform of the LASD and the Los Angeles County jails." (Dkt. 483) at 4."

"As stated earlier, however, municipalities and state officials are not liable for punitive damages. See *Graham*, 473 U.S. at 167 n.13; *Smith*, 461 U.S. at 36 n.5; *City of Newport*, 453 U.S. at 271; *Mitchell*, 75 F.3d at 527." [Dkt #535, p.9]. Defendant Baca was not a state official. He was elected by the residents of Los Angeles County and is therefore a County official who acts as the agent of the Los Angeles County Board of Supervisors." Although elected, Defendant Baca could have been replaced by the Board of Supervisors with a private entity that would have had oversight of the jails. I was denied the ability to examine any County official about why Defendant Baca or any other elected sheriff was never replaced with another agent designated with the oversight of Los Angeles County jails.

10. Much of the bias and prejudice of the jury was evidenced during voir dire. A Caucasian potential juror White woman admitted she could not be unbiased because of she saw me being dropped off in a chauffeur driven car (Uber) and she was therefore predetermined to not rule in my favor. A Caucasian man said he could not be fair and impartial because he did not like me. He did not like my diction and he did not like the way I supposedly took the potential jurors down a path of questioning. Another male juror was angry because the court ordered the

AMENDED DECLARATION OF LECIA L. SHORTER - 10

parties to return at 1:30 p.m.  and I did not get there until 1:35 p.m. During voir dire, the juror told me that he did not appreciate me walking in late because I was not respecting their time.  I told him he did not know the reason I was late.  He replied, "and you don't know what I had to give up to be here."  He too had a very angry disposition.  Fortunately, I was able to exercise a preemption to excuse him. Judge Carter said he told the parties to return at 1:15 p.m. and they had been sitting there all that time.  As a matter of practice, most courtrooms are closed for lunch from 12 pm to 1:30 p.m.  He also did not admonish the potential jurors to be respectful in their tone and manner as should all participants, which told all of the jurors that he silently acquiesced the disrespectful comments directed toward me.

11.      The trial is being held in the United States District Court in downtown Los Angeles.  The jury venire did not have one Black American as a potential juror. This matter is a civil rights case for constitutional violations committed by the Los Angeles Sheriff's Department who has a long-standing history of abusive mistreatment directed toward the Black community whether in or out of County jails.  Not having a Black American on the jury means there is no member of my community who understands the unique experiences of the Black community and racial discrimination we experience by deputy sheriffs within the Los Angeles Sheriff's Department.  An objection was made to the Court, but it was overruled.

12.      Once the trial began, Judge Carter and defense counsel made numerous references that the jury could decide that I am entitled to no damages which is contrary to Ninth Circuit precedent which states that in 42 U.S.C. §1983 cases, nominal damages must be awarded if the plaintiff proves that his or her constitutional rights have been violated.  See *Carey v. Piphus*, 435 U.S. 247, 266–67 (1978); *Jackson v. Barnes*, 749 F.3d 755 (9th Cir. 2014) (recognizing that success on the merits of a constitutional claim entitles the § 1983 plaintiff to at least an award of nominal damages).  The numerous representations of defense

AMENDED DECLARATION OF LECIA L. SHORTER - 11

1  counsel and Judge Carter have wrongfully misguided the jurors to believe that they

2  can render an award of no damages.

3  13.    On March 9, 2023, an alternate juror took a photograph of my laptop while I

4  was reading an article about deputy gangs and the tattoos they wear to represent

5  allegiance to their gang and how higher level executives within the Sheriff's

6  Department are proven members of deputy gangs.  I made numerous requests via

7  discovery and the Public Records Act for disclosure of tattoo image forms of the

8  deputy sheriffs who are defendants in this case, but those requests have been either

9  denied or extensions of time submitted.

10  14.    After the alternate juror took the photograph of my laptop, he approached

11  Judge Carter outside of the courtroom and said he wanted to tell him about the

12  article on my laptop.  Judge Carter stated that he asked the alternate juror to speak

13  to his clerk about it.  The juror then informed the clerk that he'd seen an article on

14  laptop about deputy gangs.  When court reconvened, Judge Carter stated what the

15  alternate juror told him and said he wanted to speak to the alternate juror on the

16  record and then question every juror to determine whether they saw the article and

17  whether it biased them against either side.

18  15.    The alternate juror appeared very angry.  He told the court that I had the

19  article on my laptop intentionally and for the sole purpose of allowing the jury to

20  view the article because I put the article up after Defendants Avalos and Ortiz said

21  they have no tattoos and are not members of a deputy gang.  He also said that he

22  turned around to see if other jurors were looking. He told the court that he took a

23  photograph of my laptop. Judge Carter asked the alternate juror whether he could

24  continue with the trial and be unbiased and impartial and he said he could.

25  However, the alternate juror, a Caucasian man, was very angry and resentful

26  toward me and it was obvious he was already prejudiced, if not from the very

27  beginning of trial.  Judge Carter told the alternate juror that he had done nothing

28

AMENDED DECLARATION OF LECIA L. SHORTER - 12

wrong and thanked him for serving.  However, it is illegal to take photographs or make a recording of a federal proceeding and Judge Carter did not admonish the juror.

16.    Judge Carter then brought in every juror individually and questioned them generically about whether they encountered anything that was not official evidence in the case and if so, could they continue to serve impartially and unbiased.  He did not mention the article or my laptop.

17.    Most jurors said they did not see the article and the few who did said they could remain impartial. When Judge Carter questioned juror no. 7 without mentioning my laptop, she quickly said "I didn't see the laptop." Juror No. 7 was positioned too far away from me to view my screen.  She could have only garnered information that my laptop was at issue by having discussions with other jurors which means jurors are discussing the case outside of deliberations.

18.    I objected to continuing the trial with the selected jury because it was obvious the proceedings were officially tainted.  Judge Carter decided the proceedings will continue over my objection. He instructed his clerk to contact the alternate juror and tell him to delete the photo instead of making him return to court and delete the photo in the presence of the parties.  I have no idea whether the photo was in fact deleted.

19.    On March 10, 2022, I informed the Court that I no longer wanted to participate in the proceedings because it was obvious that the jury was prejudiced toward me, the proceedings have been improperly manipulated and his rulings, particularly with regard to my lung injuries and connecting lung injuries in 2010 to my lung injuries in 2018 to the present, compromised my ability to establish my injuries and thus my damages.  I explained that members of the jury were showing obvious signs of bias and prejudice against me.  Juror No. 10 refuses to look at evidence presented on the screen, he has repeatedly turned his head away from the

AMENDED DECLARATION OF LECIA L. SHORTER - 13

1   screen as if to non-verbally indicate he is already decided and disinterested in

2   hearing this evidence in this matter.  During voir dire, this same juror made

3   statements that he had an encounter with law enforcement as a teenager during a

4   traffic.  He said that he was very fearful for himself and his Black friend who was

5   travelling with him.  Based on his demeanor during trial, I do not believe he was

6   truthful during my voir dire examination and wanted to sit as a juror so he could

7   participate in a ruling against me.  After the last break, Juror No. 10 walked to his

8   seat which is directly across from defense counsel Rina Mathevosian which means

9   he faces her when she is seated.  Juror No. 10 walked to his seat with his head

10  turned toward Deputies Avalos and Ortiz and Ms. Mathevosian.  When he got to

11  his seat, he turned and looked toward Ms. Mathevosian she made a gesture with

12  her head as if to non-verbally ask "what's up" and he nodded his head and took his

13  seat.  It seemed as though the two were familiar with each other.

14  20.    On March 10th, during Ms. Mathevosian's cross-examination of me, juror

15  No. 6 sat with her face toward defense counsel and she would not look at me.  She

16  was visibly very angry and she sat with her hands folded over her breasts and her

17  cheeks puffed in a pout.  Juror No. 6 is an elderly Hispanic woman.

18  21.    I informed the court of all that I witnessed with the exception of the non-

19  verbal communication between Ms. Mathevosian and juror No. 10.  After the jury

20  was dismissed, I asked Ms. Mathevosian did she know juror no. 10 and she said

21  she did not.  Ms. Mathevosian has a history of manipulating judicial proceedings.

22  In 2018, both defense counsel and my attorneys did not provide admitted evidence

23  to the court clerk to present during deliberations which is why the clerk's receipt

24  for returning evidence after the jury verdict was rendered is blank.  [See Dkt #340].

25  22.    I believe the court should stay the proceedings in this matter to allowing

26  viewing of the video recordings of the non-verbal gestures between Ms.

27

28

AMENDED DECLARATION OF LECIA L. SHORTER - 14

Mathevosian and Juror No. 10 as well as the other non-verbal expressions of bias and prejudice of the jurors throughout the proceedings.

23.     On March 8, 2022, a Hispanic man who identified himself as Detective Jose Hildago appeared at the job site in Rancho Cucamonga of my witness Christopher Harris and said that he was part of an LAPD/FBI fugitive task force investigating a bank robbery on a vacant construction site. Earlier that day, during direct examination of myself, I testified that although the defense is attempting to portray me as a criminal, the matters to which they refer were wrongful arrests and they have no evidence that I committed serious crimes such as bank robbery. Christopher Harris mentioned the matter to his managers, and they had no information about this individual or a task force surveillance.  He provided Mr. Harris a business card that had two badges with a painted skull in between the badges and an address of 100 W. 1st Street, Ste 480, Los Angeles, CA.  The court's address is 350 W. 1st Street.

24.     On March 10, 2023, I telephoned from a private number at the telephone number on the business card of Detective Jose Hildago.  He did not answer but I left a message informing him that it is illegal to intimidate a witness in a federal trial.  He immediately telephoned Christopher Harris and left several messages for him.  I never mentioned Christopher Harris by name.

25.     In sum, with all that has transpired thus far, it is my opinion that these trial proceedings are being conducted in violation of the Due Process and Equal Protections clauses of the 14th Amendment. Every American citizen has a constitutional right to bring their grievances to a court of law.  Every American citizen is also entitled to a fair and impartial proceeding before an impartial and unbiased judicial officer.  The foregoing clearly establishes that I have been denied a fair proceeding.

AMENDED DECLARATION OF LECIA L. SHORTER - 15

26.     In accordance with the Court's order of March 10, 2023, I have reviewed the jury instructions provided by Judge Carter and presented my objections before noon of March 12th.  Notwithstanding, I will not participate any further in these tainted proceedings. I will not provide further testimony or evidence by re-direct examination, and I will not present closing arguments because I am wasting my time given the obvious predisposition of the jury to punish the bad person whose constitutional rights were violated by every defendant in this case and instead make what he considers the right decision which is to rule in favor of the defense with regard to my claim for compensatory and punitive damages.  I will appear on March 13, 2023 to state the foregoing on the record.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.

Dated:  March 11, 2023

*Lecia Shorter*
_____

Lecia L. Shorter

AMENDED DECLARATION OF LECIA L. SHORTER - 16